**NATHANIEL SHIPPING, INC.,**
Plaintiff–Appellee,
Cross–Appellant,

v.

**GENERAL ELECTRIC COMPANY,** Defendant–Cross–Defendant Third Party Plaintiff–Appellant, Cross–Appellee,

v.

**LOUISIANA GULF SHIPYARDS, INC.,**
Defendant–Cross Plaintiff–Appellee,
Cross–Appellant.

Nos. 88–3277, 88–3817.

United States Court of Appeals,
Fifth Circuit.

Jan. 15, 1991.

Benjamin R. Slater, Jr., Monroe & Lehmann, Craig R. Nelson, Hulse, Nelson & Wanek, New Orleans, La., Barry A. Guryan, Robert C. Cadle, Fordham & Starrett, Boston, Mass., for General Elec. Co.

Harvey G. Gleason, Thomas D. Forbes, Chaffee, McCall, Phillips, Toler & Sarpy, New Orleans, La., for Nathaniel Shipping, Inc.

Mitchell J. Hoffman, Lowe, Stein, Hoffman & Allweiss, New Orleans, La., for Louisiana Gulf Shipyards, Inc.

Before BROWN, REAVLEY, and HIGGINBOTHAM, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

### Foreword

As the Court is divided on at least one significant, decisive issue, this opinion [1] is constructed sharply to delineate the differences together with specific determinations as to the outcome of the appeal.

The Court is together on Part I. In Part II, the Court parts company. Judge Brown, in what is essentially a dissent to the Court's holding in Part III, is of the view that *East River* does not cut off G.E.'s liability to Nathaniel Shipping. Judges Reavley and Higginbotham, whose views are articulated in Part III, are of the contrary view which prevails to require reversal of the District Court's judgment in favor of Nathaniel Shipping. All agree on Part IV interpretation and application of the Red Letter Clause. All agree as to Part V affirming G.E.'s liability to LGS for

---

1. For historical precedent for this appellate opinion procedure see *Stanga v. McCormick Shipping Corp.*, 268 F.2d 544, 546, 551 (5th Cir. 1959); *United States v. DeWitt*, 265 F.2d 393, 394, 401 (5th Cir.1959); *Canal Insurance Co. v. Dougherty*, 247 F.2d 508, 509, 513 (5th Cir.1957). Cf. *Louisiana Power & Light Co. v. FPC*, 483 F.2d 623, 624, 632 (5th Cir.1973); *Grigsby v. Coastal Marine Service of Texas, Inc.*, 412 F.2d 1011, 1023 (5th Cir.1969); see also, *Usery v. Tamiami Trail Tours, Inc.*, 531 F.2d 224, 239 n. 33 (5th Cir.1976); *Wallace v. House*, 515 F.2d 619, 637 (5th Cir.1975); *EEOC v. Internat'l Longshoremen's Ass'n*, 511 F.2d 273 (5th Cir.1975); *United States v. Register*, 496 F.2d 1072, 1076 n. 1 (5th Cir.1974).

the costs ($27,373.59) incurred by it in effecting warranty reconditioning due by G.E. We agree as to Part VI on all items, some of which will have little consequence in view of the reversal in Part III, but which also reverses the award of attorney's fees to both Nathaniel Shipping and LGS.

\* \* \* \* \* \*

The principal issue in this case is whether a shipowner's claim against the subcontractor with whom it has no contractual relationship or privity for substantial damage caused by the subcontractor's improper performance of the subcontract is barred by the Supreme Court's decision in *East River*.[2] The other issue concerns the efficacy of a limitation of liability clause, often called a "red letter clause," printed on the back of a standard form contract. First, is the clause valid against a claim for economic damages by a third party, with whom the defendant is not in privity, for negligent performance of a service contract? Second, is the clause valid to limit recovery by the prime contractor for costs incurred in remedying the defendant's negligence, when the small print also contained a warranty to repair or remedy any deficiency in the performance of the contract? The district court answered both of these questions in the negative. The Court's answers are set forth in Parts III, IV, V and VI.

### I. The Pliable Template

The following facts, found by the district court, are undisputed. On March 19, 1984, the thrust block on the main engine of the SERENA fractured during a voyage to New Orleans. The thrust block is that part of the shaft assembly that absorbs the thrust from the vessel's propeller. It consists of a large steel block which measures approximately 8 to 9 feet across by 4 to 5 feet high by 3 to 4 feet deep. It is fastened to the aft facing of the engine bed plate by a series of bolts, and secured by thrust pads to cushion the force received. Nathaniel Shipping, Inc., the owner of the SERENA, contracted with Louisiana Gulf

Shipyards, Inc. (LGS), to repair the thrust block. Nathaniel ordered a new block from the original manufacturer, without bolt holes, because Nathaniel and LGS decided to use the old thrust block as a guide to exactly match the placement of the bolt holes on the new block.

LGS subcontracted the drilling of the holes in the new thrust block to General Electric Company (G.E.) at a cost of $4400. LGS and G.E. discussed the purpose of the work and the means by which G.E. was to perform the drilling, and G.E. understood that it was to match the holes in the new block as closely as possible to the alignment in the old block. However, when the old block was delivered to G.E.'s workshop, its machinist fashioned a template from steam gasketing material, which is pliable, rather than from a less flexible material, such as steel. In the process of making the template and transferring it to the new block, the measurement of the holes became distorted, and hence the holes G.E. drilled in the new block were not properly aligned. The result was that extensive repair measures were required, involving additional expenditures by both Nathaniel and LGS, including a loss to the vessel which the district court calculated to be 56 days' time.

The parties then filed various complaints against each other, all of which were settled before trial, save Nathaniel's and LGS's claims against G.E. After a bench trial, the district court found that G.E. had negligently drilled the bolt holes, and awarded damages, including attorney's fees, to both Nathaniel and LGS. The district court also made the following legal conclusions regarding the red letter clause, contained in paragraph 8 of the proverbial small print on the back of G.E.'s contract with LGS.[3] First, the clause was inapplicable to Nathaniel because Nathaniel was not a party to the contract. Second, the costs incurred by LGS were recoverable under paragraph 1 of the contract, in which G.E. warranted to repair, rebuild or modify its

---

**2.** *East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986).

**3.** The text of this clause is printed at n. 33, *infra*.

work if it was not of the kind or quality specified in the contract. Third, the clause was invalid as vague, as well as void as against public policy because the amount of the limitation of damages, $4400, was an insufficient deterrent to negligence by G.E.

In this appeal, G.E. does not contest the district court's factual findings or computation of damages. But it challenges the district court's legal interpretation and the validity and scope of the red letter clause, as applied to both Nathaniel's and LGS's claims, G.E. specifically challenges liability under *East River* for Nathaniel's damages. Nathaniel cross-appeals on the amount of damages awarded to it by the district court.

## II. Of Red Letters and Foreseeable Plaintiffs: Another Round in the Struggle Between Tort and Contract

The assault on the citadel of commercial tort law proceeds these days apace.[4] As aptly summarized in the title of Professor William Jones's recent scholarly survey of the field, *Product Defects Causing Commercial Loss: The Ascendancy of Contract over Tort,*[5] the modern trend is to permit commercial parties to freely allocate, via contract, the risk of purely economic loss stemming from defective products.[6] However, for the reasons explained below, I do not think that the principles underlying this theory of contractual freedom extend so far as to bar Nathaniel's claim for damages, nor can the contract at issue be read to bar LGS's claims for damages.

Nathaniel's Claim: *Steering Clear of* East River

G.E.'s argument on appeal relies on the Supreme Court's recent admiralty decision, *East River S.S. Corp. v. Transamerica Delaval,*[7] which held that "a manufacturer in a commercial relationship has no duty under either a negligence or strict products-liability theory to prevent a product from injuring itself." [8] This preference for contract law over tort was extended beyond the precise scope of the UCC by this circuit in *Employers Insurance of Wausau v. Suwanee River Spa Lines,*[9] which held that "a plaintiff may not recover purely economic losses on a theory of negligent performance of a contract for professional services when the services were rendered as a part of the manufacture or construction of a product." [10] Because the contract at issue here involved replacing a damaged thrust block, and because the only "damage" done was to the thrust block itself, G.E. argues that *East River* bars both Nathaniel and LGS from recovering their economic losses.

I begin the analysis by noting that both the *East River* and the *Wausau* opinions refused to hold that a tort claim could never properly be asserted against a third party with whom the plaintiff was not in privity. Justice Blackmun's opinion for the Court was qualified by a statement that "[w]e do not reach the issue whether a tort cause of action can ever be stated in admiralty when the only damages sought are economic." [11] Judge King's Circuit Court opinion made the same reservation, repeating the citation of the landmark case of *Ultramares Corp. v. Touche,*[12] which held

---

4. Cf. *Ultramares v. Touche,* 255 N.Y. 170, 174 N.E. 441 (1931). *See generally* W. Keeton, D. Dobbs, R. Keeton, & D. Owen, *Prosser and Keeton on the Law of Torts,* ch. 16 (5th ed. 1984) (hereinafter *Prosser and Keeton on Torts* ).

5. 44 Miami L.Rev. 731 (1990).

6. *Id.* at 789–94.

7. See n. 2.

8. *Id.* at 871, 106 S.Ct. at 2302, 90 L.Ed.2d at 877.

9. 866 F.2d 752 (5th Cir.1989).

10. *Id.* at 766. For other applications of the *East River* rule in products liability actions, *see Gulf Boat Marine Serv. v. George Engine Co.,* 659 F.Supp. 6 (E.D.La.1986); *PPG Indus. v. Sundstrand Corp.,* 681 F.Supp. 287 (W.D.Pa.1988); *AFM Corp. v. Southern Bell Tel. & Tel.,* 515 So.2d 180 (Fla.1987) (on certification from the Eleventh Circuit).

11. 476 U.S. at 871 n. 6, 106 S.Ct. at 2302 n. 6, 90 L.Ed.2d at 877.

12. 255 N.Y. 170, 174 N.E. 441 (1931).

that a negligent accounting firm could be liable for foreseeable damages to third parties with whom it was not in privity. Both courts, however, counterposed against this principle the rule of *Robins Dry Dock & Repair Co. v. Flint,*[13] which held that a negligent defendant was not liable for damages to a person other than the one injured merely because the tort caused a breach of the injured's contract with the third party.[14]

*1. Economic Losses and Contractual Allocation of Risk.*—To decide whether this case properly falls within *East River*'s economic loss rule, then, it is necessary to examine the principles that underlie it, weighing them against established tort rules of foreseeability and duty of care to a party with whom the defendant is not in privity.

Central to the *East River* Court's reasoning was the recognition that "[c]ontract law, and the law of warranty in particular, is well suited to commercial controversies of the sort involved in this case because the parties may set the terms of their own agreements."[15] The contracts at issue in *East River* were bare-boat charters in which "the charterers took the ships in 'as-is' condition, and assumed full responsibility for them...."[16] These contracts were governed by the Uniform Commercial Code, which provides its own body of substantive warranty law, both express and implied, and much of the Court's reasoning relied on the fact that the UCC provides a level playing field on which parties to a commercial transaction may freely negotiate the terms of their bargain.[17] The Supreme Court emphasized this approach in

various ways. For example, the distinction between tort recovery for personal injuries and warranty recovery for economic losses

> ... rests, rather, on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his products. [citation omitted] When a product injures only itself the reasons for imposing a tort duty are weak and those for leaving the party to its *contractual remedies* are strong.[18]

The Court therefore concluded that:

> Contract law, and the law of warranty in particular, is well suited to commercial controversies of the sort involved in this case because the parties may set the terms of their own agreements. The manufacturer can restrict its liability, within limits, by disclaiming warranties or limiting remedies. *See* U.C.C. §§ 2–316, 2–719. In exchange, the purchaser pays less for the product. Since a commercial situation generally does not involve large disparities in bargaining power, ... we see no reason to intrude into the *parties' allocation* of the risk.[19]

Similarly, the *Wausau* court held that its result was necessary to protect the effective application of *East River*'s economic loss rule to "mixed" contracts that contain both manufacturing and service components.[20] Although the UCC did not govern the contract at issue in *Wausau*, the court noted that the parties were nevertheless similarly able to allocate the risk of negligent performance between themselves, since "[a]dmiralty law ... recognizes an implied warranty of workmanlike service which arises from contractual relationships"; this standard, "analogous to a duty

---

**13.** 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927). *See also, State of Louisiana v. M/V TESTBANK,* 752 F.2d 1019 (5th Cir.1985) (en banc).

**14.** *See also Prosser and Keeton on Torts, supra* n. 3, § 93 at 668–69.

**15.** 476 U.S. at 872–73, 106 S.Ct. at 2303, 90 L.Ed.2d at 877–78.

**16.** *Id.* at 875, 106 S.Ct. at 2304, 90 L.Ed.2d at 879.

**17.** *See id.* at 872–75, 106 S.Ct. at 2302–04, 90 L.Ed.2d at 877–80 (favorably comparing the

merits of warranty law under the UCC with the vagaries of tort law).

**18.** *Id.* at 871, 106 S.Ct. at 2302, 90 L.Ed.2d at 877 (emphasis added) (quoting *Seely v. White Motor Co.,* 63 Cal.2d 9, 18, 45 Cal.Rptr. 17, 23, 403 P.2d 145, 151 (1965)).

**19.** *Id.* at 872–73, 106 S.Ct. at 2303, 90 L.Ed.2d at 877–78 (emphasis added) (footnotes and citations omitted).

**20.** 866 F.2d at 765–67 & n. 28.

of care in tort, is implied in service contracts." [21]

The present case differs from *East River* and *Wausau* in that there was no contractual privity between Nathaniel and G.E. Nathaniel nevertheless argues that the warranty of workmanlike performance (WWLP) in admiralty runs from a subcontractor on a service contract to the owner of the vessel regardless of privity. And, since Nathaniel did not consent to the red letter clause, Nathaniel concludes that its recovery cannot be limited by the clause.

In response, G.E. argues that breach of WWLP is essentially a contractual remedy, and must be subject to the economic loss rule of *East River*, as expounded in *Wausau*, regardless of the lack of privity between the parties. Stated another way, G.E. contends that it contractually allocated its risk with LGS, who was in privity with Nathaniel, and that it would eviscerate the *East River* rule to permit Nathaniel to recover more from G.E. than LGS itself could recover.

*2. Privity Rules, Liability Rules, and Allocation of Risk: Another View of the Behemoth.*—These conflicting theories and interpretations warn us that we are dealing with a question poised on the "contract-tort interface." [22] It is therefore especially important not to refer simply to the potentially overlapping legal categories and labels that could be applied to the claims, but rather to focus on the reality of the parties' situation and the effective implications of the economic principles which must be applied.

From this viewpoint, the key weakness in G.E.'s claim, whether examined as a matter of contract or tort, is the difference between the privity rules and liability rules applicable to sales of goods and service contracts. G.E. did not assemble a defective product that was sold by LGS under an implied warranty of fitness from G.E. to LGS to Nathaniel, which would have subjected G.E. to the usual range of contractual remedies. [23] On the other hand, LGS, as a contractor, was not liable for the independent negligence of its carefully chosen subcontractor. [24]

Under the applicable liability rules, then, there was no possibility of bargaining over the allocation of risk of G.E.'s negligent performance, either between Nathaniel and LGS (because LGS was not liable for G.E.'s negligence), or between Nathaniel and G.E. (because they were not in contractual privity). Thus the key inquiry of both *East River* and *Wausau*, i.e., whether Nathaniel received " 'insufficient product value' " [25] from G.E., is simply inapplicable, because these two parties did not effectively bargain over the "value" to be received. [26]

21. *Id.* at 763 n. 17.

22. *See* Jones, *supra* n. 5, at 781.

23. *See* U.C.C. § 2–314. As should be clear from the discussion, our reliance on the distinction between contracts for goods and services in this context should not be taken to suggest any doubt of the correctness of *Wausau;* on the other hand, I also do not purport to definitively answer the question of tort liability to third parties in cases governed by the UCC.

24. *Todd Shipyards Corp. v. Turbine Serv.,* 674 F.2d 401, 410 (5th Cir.), *cert. denied,* 459 U.S. 1036, 103 S.Ct. 447, 74 L.Ed.2d 602 (1982).

25. *East River,* 476 U.S. at 872, 106 S.Ct. at 2302, 90 L.Ed.2d at 877 (quoting J. White & R. Summers, Uniform Commercial Code 406 (2d ed. 1980)).

26. By "effectively," I mean either as a matter of legal presumption (by application of the UCC's implied warranties, for example), or as a matter of fact (by actual communication between the parties).

I note in passing that G.E. argues that the red letter clause stipulated that LGS would obtain from Nathaniel a provision affording G.E. the protection described in the clause. All parties agree that LGS did not do so. Of course, LSG's failure does not limit Nathaniel's rights against G.E., but only entitles G.E. to recover damages from LGS.

More interestingly, however, it seems that G.E. has misread its own contract in a way that supports the goods/services distinction drawn here. This final sentence of the red letter clause begins with the words "If the Customer transfers title to or leases the products sold or serviced hereunder to any third party," and then proceeds to require that the Customer (LGS) obtain such protection. But there was no transfer of title or lease here, and so it would seem that even G.E. did not intend that the clause would apply to a repair contract.

And it follows from this that, whether under traditional principles of tort or contract (or, more precisely, in the absence of any contract), *East River* does not apply to abrogate G.E.'s liability for the proximate and foreseeable economic loss caused by its negligence to parties with whom it was not in privity.[27]

It should be emphasized that this distinction, if pertinent, between contracts for goods and services is, as the *Wausau* court suggested, a functional one, to be determined by the overall nature of the contract.[28] Nor should it be difficult to apply, since it is designed to reflect the different factual circumstances of the two types of contracts,[29] as is in fact well established in existing tort law.[30]

*3. Applying* Ultramares *and* Robins Dry Dock: *Nathaniel as the Paradigm Proximate and Foreseeable Tort Plaintiff.*—The next question, whether Nathaniel's claim fits within the *Ultramares/Robins Dry Dock* window of tort opportunity discussed above, is more easily resolved. G.E.'s negligent drilling directly damaged the thrust block, which was Nathaniel's property. The damages incurred by Nathaniel—whether as damages to its property, or for delay and by loss of use of the vessel during the protracted period of drilling holes in the replacement block—were thus the immediate and entirely foreseeable result of G.E.'s negligent performance of its contract with LGS, satisfying the general *Ultramares* standard.

In contrast, for the *Robins Dry Dock* exception to tort liability to apply, Nathaniel would have to have been damaged *only because* LGS was not able to perform its contract, and not because Nathaniel's property was the direct object of the injury. This is not the case; rather, this case would seem to be a classic example of a situation in which "an agent ... has accepted the control of property under contract with his principal, and under circumstances where there is an obvious risk of harm to outsiders if he does not use reasonable care," [31] thus subjecting him to tort liability to the injured party, Nathaniel.

In short, I would hold that neither *East River* nor *Wausau* bars recovery for economic loss caused by the negligence of a subcontractor, not in privity with the owner, in service contracts not involving the manufacture of a product. Nathaniel's claim for damages against G.E. falls within the *Ultramares* exception to *East River*, but it is not barred by the *Robins Dry Dock* counter-exception. *East River* and

---

27. This risk-allocation analysis explains why the result does not depend on whether the issue is initially labelled one of tort (for negligence) or contract (for breach of WWLP). Our legal system generally posits that a party to a contract (whether for goods or services) has a right of recovery for negligent performance. In the case of subcontractors, there must be a right of recovery against either the party with whom one is in privity, or the subcontractor, or both (else the duty to perform non-negligently could be subcontracted without equivalent risk). Given the existence of a liability rule excusing a non-negligent contractor for a subcontractor's negligence in a service contract, it follows that the owner must have a right to recover directly from the subcontractor.

Of course, this is not to say that the present liability rule is efficient (this would require empirical and theoretical study), nor that the parties may not (or should not) contractually assign their substantive rights to achieve a more efficient allocation of risk. Fortunately, our task is not to rewrite the structure of tort law to achieve the highest level of theoretical elegance, but simply to clarify and consistently apply the existing rules in a just manner.

28. *See Wausau*, 866 F.2d at 766 n. 28.

29. The most obvious difference between the two situations is that, as here, there is no transfer of title to the "purchaser" of the service, but this is not an ironclad difference. Rather, other economic factors necessarily must be considered: *e.g.*, differences between the various parties in professional competence, economic resources, and the foreseeability of risk.

30. *Compare* Restatement, Second, Torts § 395 (liability for negligent manufacture of dangerous product) and § 402A (strict liability) *with id.* § 409 (employer of independent contractor not liable for harms caused to others by contractor). Further, it should be emphasized that this is a distinction with a difference only insofar as it affects the party against whom recovery may be had; it does not impose a different standard of care. *See id.* at §§ 385, 404 (negligent independent contractor held to same standard of care as a manufacturer).

31. *Prosser and Keeton on the Law of Torts, supra* n. 3, § 93 at 669.

*Wausau* were designed to protect contract law from "drown[ing] in a sea of tort." [32] The result I would reach today simply preserves this natural balance, preventing the ocean of tort from evaporating under the heat of economic loss rules emanating from contract law.

### III. Judges Reavley and Higginbotham determine East River Cuts Off G.E.'s Liability to Nathaniel Shipping.

The majority of the Court reason that *East River* cuts off G.E.'s liability to Nathaniel Shipping.

In *East River*, the Supreme Court noted its fear of "contract law drown[ing] in a sea of tort" and held that a manufacturer in a commercial relationship has "no duty under either a negligence or strict products-liability theory to prevent a product from injuring itself." 476 U.S. at 871, 106 S.Ct. at 2302, 90 L.Ed.2d at 877. Thus, a purchaser whose damages are economic losses resulting from injury to the product itself, as opposed to injuries to persons or other property, can only recover in contract.

Differing with Part II, where it asserts that there was no possibility of bargaining over the allocation of risk of G.E.'s negligent performance either between Nathaniel and LGS or between Nathaniel and G.E., the questionable premise is that the Nathaniel/LGS contract did not allocate the risk because LGS, as the contractor, was not liable for the independent negligence of its carefully chosen subcontractor. Part II cites to one case, *Todd Shipyards Corp.*, 674 F.2d at 410.

*Todd* is not a very strong precedent for the premise. *Todd* is contrary to the general rule that although a contractor is not liable for the negligent torts of its competent subcontractor, the contractor may be liable for negligent breaches of the contract that cause the contractor to breach its contract with the person for whom the work is being done (in our case Nathaniel). In fact, the only case cited in *Todd* involved

tort negligence and not negligence in performing a contract. An even larger problem with the *Todd* decision is that it was decided before *East River*. This court held that *East River* applies to contracts for professional services in *Wausau*, 866 F.2d 752.

If the premise fails, and LGS may be liable for breaches of its own contract with Nathaniel due to breaches of the subcontract by G.E., then Nathaniel and LGS could allocate the risk of G.E.'s nonperformance in their own contract.

If the case is considered to be a contract case, pure and simple, then Nathaniel should be able to collect damages from LGS for breach of contract because the work was not done in the time originally contracted for. This amount of damages would be subject to any limitations in the contract between Nathaniel and LGS. LGS could then collect damages from G.E. to indemnify it for the damages it had to pay as a result of G.E.'s negligence, but this amount would be subject to any limitations in the contract between LGS and G.E.

While it is true that a contractor is ordinarily not liable for the negligence of its competent subcontractors, that rule generally applies to damages for torts committed by subcontractors. *But cf. Todd Shipyards Corp.*, 674 F.2d 401. When the negligence complained of is simply failure to live up to the terms of its contract, such as incomplete or late performance, then what is really being alleged is that the contractor has breached its contract in failing to get the work done properly. This is a non-delegable duty placed upon the contractor by way of its contract, and it cannot escape the fact that the contract was breached, even if it relied upon a subcontractor to do the work. Likewise, the customer/shipowner should not be able to sue the subcontractor directly, because all that it is alleging is that its contract was breached, and it should not matter whether

---

**32.** *East River,* 476 U.S. at 866, 106 S.Ct. at 2300, 90 L.Ed.2d at 874 (citing G. Gilmore, The Death of Contract 87–94 (1974)).

or not its contractor subcontracted the work.

■ This scenario changes when there is property damage or personal injury caused by the subcontractor's negligence. The suit is no longer merely a cause of action in contract, but a tort action. The shipowner is no longer just complaining that its contract was breached, and that it did not get the benefit of its bargain, but that because of the subcontractor's negligence, there was damage to property or personal injury, giving rise to damages in tort. In this situation a subcontractor could not avoid liability because it was not in privity with the shipowner, because in tort a duty is owed to more than the party with whom one has contracted. *Ryan Stevedoring Co. v. Pan Atlantic Steamship Corp.*, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956). Under *Ryan* the shipowner can directly sue the negligent subcontractor for indemnity for any damages the shipowner must pay for injuries caused by the subcontractor's failure to perform in a workmanlike manner.

Under *Ryan* there are valid public policy reasons for allowing the shipowner to be indemnified by the tortfeasor/subcontractor. Hence the doctrine of implied warranty of workmanlike performance (WWLP) arose.

■ These public policy reasons drop out when the suit is simply one for breach of contract. While personal injuries or other torts are not very easily predicted with accuracy, a shipowner who is contracting to have work done can more easily predict what might happen if there is delay in completing the contract, and can take precautions, such as taking out insurance. When the parties have equal bargaining power they can negotiate price and limitations on liability for breach.

Here the only injury that Nathaniel is complaining about is delay in getting its ship fixed. The district court seemed to analyze the case as one for property damage, but that is not really Nathaniel's complaint. G.E. erred in preparing a component part, but the part that Nathaniel eventually received was a repaired part, and

was no longer defective. If G.E. had not done the work negligently, but had simply taken 56 more days than had been originally anticipated to do it correctly, Nathaniel would not have had any action against G.E. under the WWLP theory. That the delay was caused by G.E. originally drilling the holes in the wrong places should not make any difference.

In addition, the 1972 amendments to the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. sec. 901 *et seq,* and particularly § 905(b), have legislatively removed the WWLP implied indemnity in the area it was originally created to fill (injuries to longshoremen). In *Hobart v. Sohio Petroleum Co.*, 445 F.2d 435, 439 (5th Cir.1971), the court held "that the predicate of the doctrine [WWLP] is the shipowner's absolute non-delegable liability under the seaworthiness guaranty." The court went on to say that it hesitated

> ... to extend [the *Ryan* doctrine] beyond those controversies involving the special rules governing the obligation and liability of shipowners which necessitated its formulation.

*Id.*

In *Gator Marine Service Towing, Inc. v. J. Ray McDermott & Co.*, 651 F.2d 1096, 1100 (5th Cir.1981), this court held:

> Except in the context of independent contractors on drilling barges, our Circuit has been reluctant to expand the applicability of the *Ryan* doctrine. [citation omitted] In 1972 Congress legislatively abrogated the Ryan doctrine at its point of origin, injured longshoreman. [citation omitted] There is little logical appeal in this proposed extension of a doctrine so withered.

This analysis is made more complicated, however, by the holding in *Todd Shipyards Corp.*

*Todd* was decided prior to the Supreme Court's decision in *East River*, which held that when the only damage was to the product itself, then the case was one in contract, not tort, and the parties should be limited to their contract remedies. LGS maintains that *East River* should not apply

to this case because it was a products liability case, and here G.E. was providing services.

*East River* principles were applied to a service contract in *AFM Corp. v. Southern Bell Tel. and Tel. Co.*, 515 So.2d 180 (Fla. 1987) (question certified by the 11th Circuit). Similar rulings were reached in *PPG Industries v. Sundstrand Corp.*, 681 F.Supp. 287 (W.D.Pa.1988) and *Gulf Boat Marine Services v. George Engine Co.*, 659 F.Supp. 6 (E.D.La.1986). In fact the fifth count of the plaintiffs' complaint in *East River* was in negligence for the alleged improper installation of a valve on the Bay Ridge, which is essentially a service claim. 476 U.S. at 861, 106 S.Ct. at 2296, 90 L.Ed.2d at 870. This circuit has held that the rule of *East River*, precluding a products liability tort claim when the only injury claimed is economic loss, applies to contracts for professional services rendered in connection with manufacture or construction of the product by a party other than the builder or manufacturer. *Wausau*, 866 F.2d 752.

Part II states that our case "differs from *East River* and *Wausau* in that there was no contractual privity between Nathaniel and G.E." In fact, however, there was also no contractual privity between the parties in *East River*. In evaluating the plaintiffs' claims, the Court looked to the contract between the plaintiffs and the trust from which they chartered the ships and found that the plaintiffs took the ships "as is." *See East River*, 476 U.S. at 875, 106 S.Ct. at 2304, 90 L.Ed.2d at 879.

On these principles the Court (per Judges Reavley and Higginbotham) holds that *East River* precludes recovery by Nathaniel Shipping. The consequence is that the judgment of the District Court thereon is reversed.

## IV. LGS's Claim: When Clauses Collide

G.E. advances several overlapping arguments to the effect that, regardless of the efficacy of the red letter clause against Nathaniel, the clause is nevertheless effective to bar, or at least limit, its liability to LGS. As noted, the district court held in the alternative that the clause did not bar LGS's claim because its costs were recoverable under the warranty in paragraph 1 of the LGS/G.E. contract, that the limitation was void as vague when read in conjunction with paragraph 1, and that the clause was invalid as against public policy because it did not sufficiently deter G.E.'s negligence. Applicable portions of the clause are set out in the margin.[33]

We first consider the effect of the express warranty, paragraph 1 of the LGS/G.E. contract, relevant portions of which are set out in the margin.[34] G.E.'s

---

**33.** 8. LIMITATIONS OF LIABILITY AND INDEMNITIES

. . . . .

(b) In no event, whether as a result of breach of contract, warranty, or tort (including negligence), shall [G.E.] or its suppliers be liable for *any consequential or incidental damages* including, but not limited to, loss of profit or revenues, loss of use of equipment furnished . . .

(c) Except as provided in the article entitled "Patents," [G.E.'s] liability on any claim of any kind (including negligence) for any loss or damage arising out of, or resulting from this agreement, or from the performance or breach thereof, or resulting from the products or services furnished hereunder, *shall in no case exceed the price of the specific product or service which gives rise to the claim.* All such liability shall terminate upon the expiration of the warranty period specified in Article 1, "Warranty."

(Emphasis supplied).

**34.** 1. WARRANTY

a. Warranty Period. This warranty shall apply only to defects appearing within one year from the date of completion of the service by [G.E.]. . . .

b. Warranty on Repair, Rebuild, Modification. [G.E.] warrants to [LGS] that the equipment, material and components and the repair, rebuild or modification services furnished hereunder will be *free from defects in material or workmanship and will be of the kind and quality specified in the contract.* . . . The warranties and remedies set forth herein are conditioned upon . . . [LGS] promptly notifying [G.E.] of any defects and, if required, promptly making the equipment available for correction.

If any equipment, material, component or service *fails* to meet the *foregoing warranties,* [G.E.] shall thereupon correct such failure either, at its option, (i) *by repairing* any *defective* equipment, material, component or service, or (ii) by making available F.O.B.

response to the district court's finding regarding this warranty clause is that any recovery is limited by the amount stated in paragraph 8, that the 'repair or replace' provision was the exclusive warranty remedy, and that G.E. did in fact comply with its warranty because it satisfactorily repaired the thrust block. Under this theory, LGS is entitled to no recovery at all, since G.E. stayed within the terms of its warranty.

■ G.E. doth protest too much. In general, "[c]lauses that purport to limit a party's legal responsibility are strictly construed and to be given effect must clearly express the intent of all parties whose liability is altered by the agreement." [35] Where, as here, an express warranty and a disclaimer of liability potentially conflict, we must harmonize the two, construing ambiguities *contra proferentem* and in favor of warranty coverage. [36]

■ Even if we were not guided by these principles, we would agree with the interpretation adopted by the district court, which held that LGS's repair costs were not "incidental or consequential damages" under either paragraphs 8(a) or (b). In support of this view, we note that G.E.'s own actions belie its self-serving interpretation: under G.E.'s theory, it could have expended $4400 on repair efforts and then walked away from the job, citing the red letter clause. Yet G.E., in support of its argument that it met its obligation, now makes much of the fact that it spent more than twice the amount of the contract value in its repair efforts. This does not amount to a waiver, of course, but it nevertheless comports with the district court's more realistic reading of the warranty clause, which we adopt, under which the costs incurred by G.E. in meeting its "repair or replace" warranty were not limited by the red letter clause. [37]

■ This brings us to G.E.'s second argument, which is that no costs were recoverable by LGS because G.E. in fact met its warranty obligation. It is true that the thrust block was eventually made serviceable—56 days' of lost use after G.E.'s negligence was discovered—and after significant expense by LGS in assisting G.E. in the effort. A repair or replace warranty provision is not a license to hold a customer hostage; it implies that the breach will be remedied as promptly as possible under the circumstances. The district court found, and G.E. does not dispute, that the costs incurred by LGS were for repairs necessary to make the thrust block serviceable, saving G.E. from either greater expense or a finding that it had breached its warranty. Hence G.E. cannot disclaim liability for LGS's costs on the theory that it met its obligations under the warranty.

■ G.E.'s final, partial, line of defense is that, "[p]ursuant to the LGS/G.E. Contract, LGS agreed to pay all 'in' and 'out' costs associated with warranty correction work." The contract contains no such general cost-shifting provision, and we decline to read such a disclaimer into it. [38] In sum,

---

[G.E.]'s plant or other point of shipment any necessary repaired or replacement parts.

e. Warranty Stated Above is Exclusive. The preceding paragraphs set forth the exclusive remedies for claims ... whether claim is made in contract or tort (including negligence).....

(Emphasis added).

**35.** *Bosnor, S.A. De C.V. v. Tug L.A. BARRIOS,* 796 F.2d 776, 781 (5th Cir.1986).

**36.** *See, e.g., Employers Ins. of Wausau v. Trotter Towing Corp.,* 834 F.2d 1206, 1210 (5th Cir.1988) (construing insurance contract in favor of coverage).

**37.** This interpretation applies only to the scope of the warranty within its effective period of operation, which in this case was one year. We express no opinion regarding the validity of the limitation provision after the warranty's expiration date.

**38.** G.E. only cites to language in paragraph 1(b) that LGS was required to "promptly mak[e] the equipment available for correction," and claims that the district court erroneously awarded LGS $3,640 in costs for the removal of the thrust block from the engine bed. This is not a general cost-allocation provision; it is simply a condition precedent to the coverage of the warranty. It thus says nothing about who shall bear the costs of making the material available.

In many cases, of course, such return costs are minimal; here, however, they equal 83% of the contract price. Because G.E.'s negligence could not reasonably have been discovered before the thrust block was delivered, and because

the red letter clause was no doubt designed to disclaim as much liability as was legally possible, but the district court correctly held that it did not bar LGS's recovery of the costs incurred by its efforts to help G.E. repair the thrust block.

Because we hold that the terms of the warranty provision were sufficient to affirm the district court's judgment in favor of LGS ($27,373.59), we do not reach the other grounds of decision relied on by the district court in its judgment.

## V. Getting Their Two Cents In: Nathaniel's Additional Claim for Damages and G.E.'s Challenge to the Award of Attorneys' Fees

As G.E.'s liability to Nathaniel is substantially reversed, (see Part III) there is no need to review Nathaniel's inherent claim for loss of use of the vessel. Nevertheless, until the case is fully concluded we think it appropriate to rule on these matters.

### A. Nathaniel's Claims

Nathaniel appeals the district's court's refusal to award damages for (i) garbage disposal costs, (ii) the costs of Nathaniel's local agent, and (iii) lost profits. Such findings of fact by the district court are not to be overturned unless found to be clearly erroneous.[39]

■ *1. Where's the Garbage?*—Nathaniel's first claim is straightforward: Nathaniel points out that the district court found that it was entitled to recover for garbage disposal fees in the amount of $19.50 per diem, but failed to include this amount in its actual calculation of damages. G.E. does not dispute this point as a factual matter. Our review of the district court's otherwise careful opinion reveals that Nathaniel is correct. Because this is essentially a clerical error that is manifest on the face of the district court's opinion, we need not remand the matter to the lower court; instead, we find merely that

this would properly be a part of Nathaniel's damages, if otherwise allowable.

*2. Who's the Agent Here?*—Second, Nathaniel challenges the district court's finding that the SERENA did not need the services of both Hong Kong Shipping Agencies, its Hong Kong manager, and Biehl & Co., its local agent, arguing that both were erroneously classified as the SERENA's agents. However, the district court's opinion showed that it was aware of the different roles played by the two entities: in its opinion, it noted that Biehl was paid an "agency fee," while Hong Kong Shipping received a daily "management fee." Nathaniel offers no other evidence sufficient to show that the district court erred in finding that Biehl's costs were not recoverable, and its judgment on this issue is affirmed.

■ *3. Where Did the Profits Go?*—Third, Nathaniel claims that the district court erred in its calculation of Nathaniel's claim for loss of use of the ship for 56 days by failing to include the average daily earnings of the vessel. The basis of Nathaniel's contention is that the court was misled by the inaccurate testimony of G.E.'s expert witness on damages, who calculated damages according to a time charter method by deducting the expenses incurred on the deadend empty return voyage from Rotterdam to New Orleans. Nathaniel, phrasing it in more likely terms of a voyage chartered method, in which automatically such costs are excluded from profits; however, it claims that, if the former method is used, it must also be entitled to add these costs to its total detention costs, and so reach the same amount of lost profits as calculated under its own method.

Because we detect faulty reasoning by the expert for G.E. on which the trial judge seemed to rely, we hold the Court's findings are well within the Plimsoll line of F.R.Civ.P. 52(a) as clearly erroneous. This is shown by Exhibit P–13, which on its face reflects earnings and expenses for the full

---

such removal costs were, and were within G.E.'s warranty clause, both foreseeable and necessary to effectuate the repairs, we think the district court was correct to impose them on the G.E.

**39.** *See, e.g., Cheek v. Williams–McWilliams Co.,* 697 F.2d 649, 652 (5th Cir.1983).

round voyage from New Orleans to Rotterdam to New Orleans. For that full voyage of 46 days (steaming 32 days, in port 14 days) the earnings were precisely $1,377.86 per day, as claimed.

The fact that the vessel returned empty on the return to New Orleans, was not, as asserted by the G.E. expert, ignored or concealed. So, on the face of things Nathaniel supports its claim to the dollar. Consequently, we think it unnecessary that the case be remanded for the District Court, to reconsider the detention claim since our conclusion is fully supported by the principles set out at length in *Delta S.S. Lines, Inc. v. Avondale Shipyards, Inc.*[40]

### B. G.E.'s Claims: Curbing The Attorneys' Fee-ding Frenzy.

For its part, G.E. challenges the district court's award of attorneys' fees to both Nathaniel and LGS. The district court held that attorneys' fees were recoverable by Nathaniel and LGS because they were foreseeable damages resulting from G.E.'s breach of its warranty of workmanlike performance, citing the general Fifth Circuit rule permitting recovery for such damages. In reaching this result, the district court relied on recent circuit precedent that in fact misconstrues the actual rule for recovery of attorneys' fees. To explain the district court's error, we must re-examine the genesis and scope of the rule in this circuit.

In 1963, this circuit, in *Strachan Shipping Co. v. Koninklyke Nederlandische S.M.,*[41] created an exception to the traditional "American Rule" that attorney's fees were generally not recoverable, holding that indemnification for attorney's fees were recoverable as foreseeable damages for breach of a warranty of workmanlike performance from a stevedore to a shipowner *for the costs of defending against a claim by a third party.*[42] This indemnity rule did not, however, extend to recovery of fees for litigation against the party in breach to actually determine liability.[43] In some cases, the rule was abbreviated to the simple formula that attorneys' fees were recoverable as foreseeable damages resulting from a breach of WWLP, but each of these cases involved claims for fees for defending against claims by third parties; [44] the rule nevertheless remained that attorneys' fees against the defendant to establish liability were not themselves recoverable.[45]

So matters stayed until 1982, when, in *Todd Shipyards Corp.,*[46] this court relied on the general statement of the rule to authorize recovery of attorneys' fees by a shipowner against its contractor and subcontractor for the litigation that established their liability.[47] This general formulation of the rule was repeated by a later appellate panel after the case was remanded,[48] but this time the only issue was whether such damages were an integral part of the scope of relief for jurisdictional purposes; as with the earlier citations of the short form of the rule, the court did not have to consider against whom, and when, such damages might be recovered.[49]

---

**40.** 747 F.2d 995, 1000–03 (5th Cir.1984).

**41.** 324 F.2d 746 (5th Cir.1963).

**42.** *Id.* at 747.

**43.** "There can be no recovery for attorneys' services and expenses incurred in establishing the right to indemnification." *Signal Oil & Gas Co. v. BARGE W–701,* 654 F.2d 1164, 1178–79 (5th Cir.1981) (quoting *Williams v. California Co.,* 289 F.Supp. 376 (E.D.La.1968)).

**44.** *See Thibodeaux v. Texas Eastern Transmission Corp.,* 548 F.2d 581, 587 (5th Cir.1977); *McCawley v. Ozeonosum Componia Maritime, S.A.,* 505 F.2d 26 (5th Cir.1974).

**45.** *Ryan Walsh Stevedoring Co. v. James Marine Serv.,* 792 F.2d 489 (5th Cir.1986).

**46.** 674 F.2d 401.

**47.** *See Id.* at 415 (citing *Strachan, McCawley,* and *Thibodeaux*).

**48.** *Todd Shipyards Corp. v. Auto Transportation, S.A.,* 763 F.2d 745 (1985).

**49.** *See id.* at 751 (repeating the citation of *Strachan, McCawley,* and *Thibodeaux*). This is, of course, only a technical distinction, since if such relief could not properly be had in the first instance, then the district court's failure to fix the amount of such recovery would not neces-

Careful examination of the precedents relied upon by the first *Todd Shipyards* court makes it clear that the court mistakenly changed a specific rule of indemnification into a general rule of admiralty damages, without overruling the holding of the earlier cases that attorneys' fees were not recoverable for suits to establish liability between the indemnitee and the indemnitor. In such a situation of conflicting rules, our choice is clear: "[u]nder the principle of *stare decisis,* the older case law must control."[50] Thus, even if we were to conclude that *Todd Shipyards* effected a conscious expansion of the *Strachan* rule, or that the expanded rule was in fact more efficient, we must consider ourselves bound by the more narrow formulation of the rule, under which neither Nathaniel nor LGS may recover its attorneys' fees from G.E. We therefore must reverse the district court's award of fees as to both Nathaniel and LGS.

### CONCLUSION

The District Court's judgment awarding damages to Nathaniel Shipping against G.E. is reversed and rendered. Its judgment as to the Red Letter Clause is affirmed, as is the recovery by LGS for its remedial costs from G.E. The award of attorney's fees to both Nathaniel Shipping and LGS is reversed.

AFFIRMED IN PART.

REVERSED AND RENDERED IN PART.

sarily bar appellate jurisdiction. In any case, the point is arguably dicta, since the court held that the earlier panel had interlocutory admiralty jurisdiction. *See id.* The point of this discussion is simply to point out that the second panel did not specifically re-examine the merits of the earlier panel's application of the rule.

50. *United States v. Edelman,* 873 F.2d 791, 794 (5th Cir.1989).