# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 3, 2013

No. 12-30378

Lyle W. Cayce
Clerk

SMITH MARITIME, INCORPORATED

Plaintiff

v.

L/B KAITLYN EYMARD; ET AL

Defendants

ASSOCIATED GAS & OIL COMPANY, LIMITED,

Counter-Claimant - Appellant

v.

TRAM SHIPYARDS, INCORPORATED

Counter Defendant - Appellee

Appeal from the United States District Court
for the Western District of Louisiana
(10-CV-1871)

Before DAVIS, JONES and SMITH, Circuit Judges.

PER CURIAM:[*]

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 12-30378

In this dispute between the owner of two liftboats, Associated Gas & Oil Company, Limited ("Associated"), and Tram Shipyards, Incorporated ("Tram"), a shipyard which performed work on the liftboats, the issue is whether the economic loss rule of *East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858 (1986), precludes claims by the vessel owner Associated for economic loss resulting from the negligence of Tram. We find that *East River* and its progeny clearly apply to these facts, barring recovery to Associated under a products liability or other tort theory and limiting its recovery to its contractual remedies.

I.

On or about February 16, 2010, Associated purchased two self-elevating liftboats, the L/B KAITLYN EYMARD ("KAITLYN") and L/B NICOLE EYMARD ("NICOLE"), from Offshore Marine, Inc. ("OMI"), pursuant to an Asset Purchase Agreement. Under the Asset Purchase Agreement, OMI agreed to provide certain spare parts, and to provide and install additional living quarters and accessories on the two vessels. Since OMI does not own a shipyard, and thus could not install the additional living quarters and accessories on the liftboats itself, OMI used its sister corporation, Tram Shipyards, Inc. ("Tram"), to purchase the materials and perform the installation of the additional living quarters and accessories. In the course of installing the additional living quarters on the NICOLE, Tram cut, extended, and re-welded the crane boom cradle stanchion of the hydraulic pedestal crane mounted aboard the NICOLE.

Associated modified these liftboats to perform work in Nigeria under a contract Associated had recently won. This required Associated to ship the vessels from Louisiana to Nigeria. As the flotilla transporting the liftboats to Nigeria encountered rough seas, the stanchion snapped at the site of the weld, causing the crane boom on the NICOLE to swing wildly and crash into the additional living quarters, causing damage. As a result of this damage, the

No. 12-30378

flotilla had to be diverted to St. Thomas, British Virgin Islands, for evaluation of the damage. After recommencing the voyage, further rough seas exacerbated the damage, and the flotilla diverted to Trinidad and ultimately returned to Amelia, Louisiana for repairs, where the vessels were located at the time of the filing of the instant suit.

Associated alleged in its Counterclaim against Tram that the damage from the swinging crane, the resulting diversions from the planned route for evaluation of the damage, and the ultimate failure of the liftboats to reach Nigeria to perform the work for which Associated purchased the liftboats, are all a direct result of the negligence of Tram in (1) unilaterally deciding to cut and re-weld the crane boom cradle stanchion aboard the NICOLE; (2) re-welding the crane boom cradle stanchion with such inferior workmanship that the weld could not withstand the stresses of mere rough seas; and (3) failing to have the weld inspected or certified to ensure its structural soundness, integrity, and ability to survive rough sea conditions. Furthermore, the delays during, and ultimate failure of, the transport of the vessels to Nigeria, as directly caused by the negligence of Tram, caused Associated to suffer a crippling loss of profits because the liftboats were not performing the work for which they were purchased and were not generating income for Associated during the lengthy repair process in Louisiana.

After other parties in this suit settled, Tram filed a motion for summary judgment claiming that despite any factual dispute, the economic loss rule of *East River* precluded Associated from recovering economic losses against Tram. The district court granted Tram's motion and dismissed Associated's counterclaim. Associated appeals.

II.

The disposition of this case depends on whether the facts require application of the rule announced by the Supreme Court in *East River*. In *East*

*River*, a shipbuilder contracted with the defendant Delaval to design, manufacture and supervise the installation of turbines in four supertankers it was building. 476 U.S. at 859. After the ships were put into service under a charter to the plaintiffs, the turbines on all four ships malfunctioned due to design and manufacturing defects. Only the turbines were damaged as a result of the defects. *Id.* at 860-61. The Supreme Court held that a manufacturer in a commercial relationship has no duty under either a negligence or strict products-liability theory to prevent a product from injuring itself. *Id.* at 871. Thus the charterer could not recover for damage to the turbines or resulting economic losses from Delaval.

*East River* has been extended to claims brought against a provider of professional services (construction supervision) provided to a vessel manufacturer, *Employers Ins. of Wausau v. Suwannee River Spa Lines, Inc.*, 866 F.2d 752 (5th Cir. 1989), and a repairer of a vessel, *Nathaniel Shipping, Inc. v. General Elect. Co.*, 920 F.2d 1256 (5th Cir. 1991)(*Nathaniel Shipping I*). In *Wausau*, plaintiff chemical company entered into a contract with a naval architectural firm and a ship manufacturer for the construction of a vessel to be used to ship its chemicals. 866 F.2d at 756. On its second voyage, the vessel's tug section broke loose from the barge section and sank. *Id.* The plaintiff filed suit alleging that the vessel was unseaworthy on delivery. *Id.* at 757. This court precluded "recovery in maritime tort for purely economic loss stemming from the negligent performance of a contract for professional services where those services are rendered as part of the construction of a vessel." *Id.* at 755. Plaintiffs were therefore limited to their contractual remedies. *Id.*

In *Nathaniel Shipping I*, the plaintiff shipowner Nathaniel Shipping contracted with a shipyard, Louisiana Gulf Shipyards (LGS) to replace a damaged thrust block. 920 F.2d at 1258. LGS contracted with defendant General Electric to drill holes for the new thrust block. *Id.* Nathaniel Shipping's

suit alleged that General Electric negligently drilled the holes and sought economic damages allegedly caused by the negligence. *Id.* Even though the shipowner was not in contractual privity with General Electric, who provided repair services rather than construction or manufacture of a vessel, this court held that the *East River* economic loss rule precluded the shipowner's recovery against General Electric. *Id.* at 1264-65. In *Nathaniel Shipping, Inc. v. General Elec. Co.*, 932 F.2d 366 (5th Cir. 1991)(*Nathaniel Shipping II*) (on petition for rehearing), this court declined to find a distinction between services for the manufacture of a new vessel and services related to the repair of an existing vessel. "Such a distinction would be inconsistent with our reasoning in *Wausau*. The public policy concerns underpinning tort duties are not present here, and the parties are capable of defining satisfactory performance and allocating the risk of defective performance in their contract." *Id.* at 368, n.3.

Associated argues that this case does not fall within the rule of *East River* and the other cases discussed above because it involves, not a vessel's manufacture or repair, but the modification of a vessel. We see this as a distinction without a difference insofar as the applicability of the *East River* rule is concerned. In the Asset Purchase Agreement with OMI, Associated purchased two vessels with living quarters installed. Associated took the Purchased Assets (which is defined as the Vessels and the Living Quarters (Additional Equipment) "as is, where is"). Associated's complaint, like those in *East River* and the other cases described above, is that it did not receive the benefit of its bargain because the quality of the product did not meet its expectations. As the Supreme Court stated in *East River*, "Damage to a product itself it most naturally understood as a warranty claim. Such damage means simply that the product has not met the customer's expectations, or, in other words, that the customer has received 'insufficient product value.'" 476 U.S. at 872. Such claims are best governed by contract law and the law of warranty - not tort.

No. 12-30378

Associated also argues that the living quarters that were added to the liftboats and damaged by Tram's alleged negligence are "other property" so the vessel did not damage 'itself" and its claims are not subject to the *East River* rule.  This argument requires us to define "other property" for this purpose.   In *Shipco 2295, Inc. v. Avondale Shipyards, Inc.*, the plaintiff brought tort claims against the manufacturer of several vessels for alleged design defects in the propellers and hull brackets and brought claims against the supplier of the vessels' steering systems for alleged defects.   825 F.2d 925, 926 (5th Cir. 1987).  The plaintiffs argued that defects in certain components of each vessel caused damage to unrelated components in the same vessel. *Id.* at 928.  They argued that the resulting damage was damage to "other property" and that *East River* recognizes a purchaser's right to recover economic losses resulting from damage to the product in tort when the defect in the product causes damage to other property. *Id.*  To determine "what is the product?" this court looked to the object of the contract or bargain that governs the rights of the parties. *Id.*   This court found that *East River* barred plaintiff's claims against the manufacturer and against the supplier because the "object of the contract" was the completed vessel and not the component parts of the vessel. *Id.*

Associated argues that the living quarters are "other property" because the purchase from OMI set a separate price for that component.  The Asset Purchase Agreement in this case does set separate prices for the vessel and the added living quarters.[1]  However, the Asset Purchase Agreement also combines the

---

[1]  The relevant provisions of the contract follow:

WHEREAS, Seller desires to sell to Buyer, and Buyer desires to acquire from Seller, the Vessels as defined herein, for a total purchase price for the Vessels of Thirty-Five Million Two Hundred Thousand and No/100 United States Dollars ($35,200,000.00 USD) on the terms and conditions specified herein;

No. 12-30378

Vessels and other components including the Living Quarters / Additional Equipment as the "Purchased Assets."

> 1.1 <u>Purchase and Sale of Assets</u>, At the Closing, Seller will sell, convey, transfer, assign, and deliver to Buyer (i) the **Vessels** together with their engines, tackle, winches, cranes, fuel on board, cordage, general outfit, electronic and navigation equipment, radio installations, appurtenances, appliances, inventory, spare parts, stores, tools and provisions on board each of the Vessels; (ii) all Permits (to the extent transferable) relating to the Vessels transferred; (iii) all business records relating exclusively to the Vessels (the "Records"); (iv) any technical or regulatory documentation already aboard the Vessels, including classification certificates, loadline certificates, radio licenses, operating manuals, vessel logs and preventative maintenance manuals (collectively, the "Vessel Documentation"); and (v) all drawings and intellectual property related to each of the Vessels (the "Intellectual Property"). The assets described in the foregoing clauses (i) through (v) are hereinafter collectively referred to, together with the **Additional Equipment**, as the "**Purchased Assets**." (emphasis added)

The Asset Purchase Agreement defines the "Purchased Assets", which are the object of the contract as subject to the warranty. In para. 3.4, the Purchased Assets are conveyed "as is, where is." Accordingly, the Living Quarters are not "other property" for purposes of this analysis and Associated cannot avoid application of the rule from *East River*.

---

WHEREAS, In addition to the Vessels, Buyer has agreed to purchase from Seller additional equipment, specifically Living Quarters and Accessories as detailed on the ProForma Invoice attached hereto as Exhibit "A" and incorporated herein by reference (hereinafter "**Additional Equipment**"), for an additional Seven Hundred Twenty Seven Thousand Nine Hundred Twenty Seven and No/100 United States Dollars ($727,927.00);

No. 12-30378

### III.

The crane boom cradle stanchion and the living quarters that were damaged were integral parts of the vessel as it was sold to Associated. The economic losses Associated suffered as a result of the damage are not recoverable under tort theories from Tram. Under *East River*, the plaintiff is relegated to its rights under the contract. The district court properly dismissed Associated's claims on summary judgment. AFFIRMED.