B & B SCHIFFAHRTS GMBH & CO.

v.

AMERICAN DIESEL & SHIP
REPAIRS, INC., et al.

No. CIV.A. 99–3860.

United States District Court,
E.D. Louisiana.

March 13, 2001.

Gary Alan Hemphill, Cynthia Anne Wegmann, Michael M. Butterwoth, Terriberry, Carroll & Yancey, New Orleans, LA, for Plaintiff.

Derek Anthony Walker, Alexandra Marie Lamothe, Chaffe, McCall, Phillips, Toler & Sarpy, LLP, Joseph Patrick Tynan, John Barr Gooch, Jr., Montgomery, Barnett, Brown, Read, Hammond & Mintz, New orleans, LA, for Defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

BARBIER, District Judge.

This matter came on for trial before the Court, sitting without a jury, on February 12, 2001. Following the trial, the Court allowed the parties until February 15, 2001 to file any briefs on the issue of attorney's fees, at which time the Court took the matter under submission. The parties have stipulated to many of the facts as set forth in the pre-trial order. In accordance with Federal Rule of Civil Procedure 52(a), the Court now renders its findings of fact and conclusions of law. To the extent the findings of fact are more properly classified as conclusions of law, they should be so considered; and to the extent the conclusions of law are more properly classified as findings of fact, they should be so considered.

### FINDINGS OF FACT

1. Plaintiff, B & B Shiffarhts GMBH & Co. ("B & B"), is the owner of the M/V WESER, an oceangoing cargo vessel which experienced engine problems during a call in New Orleans in September, 1999. On or about September 25, 1999, a survey of the engine was conducted in the presence of, among others, a representative of the engine's manufacturer (Walter Brede), a surveyor appointed by the vessel's hull underwriters (Ben Haveman), and an independent surveyor for the Classification Society of the vessel (Alfred Schroeder), which revealed damage to the main engine crankshaft.

2. The crankshaft is a large, cylindrical piece of steel which connects the engine pistons to the tail shaft, which in turn rotates the ship's propellor. The crankshaft is primarily made up of component parts called "crankpins" and "journals" which must be perfectly round within extremely small tolerances measured in fractions of millimeters. An engine component called a "bearing" fits over and rotates around the crankshaft and connects the engine's pistons, which move up and down, to the crankshaft, which turns on its longitudinal axis. If the crankshaft does not function normally, the engine will break down and the ship will lose power and steerage, with potentially disastrous consequences.

3. When it was removed from the engine on or about October 7, 1999, the

WESER crankshaft was found to be bent (a condition called "run out"), and certain of its crankpins were found to be in an oval rather than a perfectly cylindrical shape. These problems had to be repaired before the ship could return to service.

4. B & B contacted defendant American Diesel & Ship Repairs, a New Orleans-based engine repair company, about performing the necessary work. Representatives of American Diesel inspected the crankshaft and in due course made an oral repair proposal, which was accepted by plaintiff. This contract was not reduced to writing, which is not unusual in the industry for jobs of this size and type.

5. For a quoted price of $8,600.00, American Diesel undertook to eliminate or reduce to within acceptable tolerances the bend in the crankshaft, or "run out", and to eliminate or reduce to within acceptable tolerances the ovality in the crankpins.

6. Because American Diesel lacked the equipment necessary to repair such a large crankshaft, American Diesel in turn subcontracted the repair work to defendant Fusion, Inc. ("Fusion"), a repair company based in Houston. Fusion agreed to charge American Diesel $6,300.00 for the work.

7. American Diesel and Fusion did not sign a contract for the subcontracted repairs.

8. On or about October 9, 1999, American Diesel transported the crankshaft by truck to Fusion's facility in Houston and then retrieved it by truck about a week later. While at Fusion, the crankshaft pins and journals were ground with a grinding tool especially designed for this purpose. This process necessarily reduces the circumference of the crankshaft, and, if done properly by the technician, would in this case have eliminated the bend in the crankshaft and have produced pins and journals which were perfectly cylindrical, to within acceptable tolerances.

9. By industry rule, whenever a crankshaft is ground, it is ground in half-millimeter increments. This is because the engine bearings, which must fit perfectly around the crankshaft to within fractions of a millimeter, are manufactured in half-millimeter increments.

10. Following the attempted repairs by Fusion, when the crankshaft was inspected by B & B's representative and American Diesel at American Diesel's facilities on or about October 22, 1999, in contrast to Fusion's post-repair measurements, American Diesel's and B & B's measurements, which were in agreement, showed the crankshaft to be within *unacceptable* manufacturer tolerances and in *worse* condition than prior to the repairs. Specifically, the shaft had more "run out", it was tapered (that is, the journals were larger on one end than they were on the other), and the crankpins had more ovality.

11. The shaft had been transported to and from Houston on a flatbed truck and supported in a special box. There is no evidence that there was any accident, dropping of the shaft, or any other circumstance or condition which could have caused the "run out." Upon receipt of the shaft at Fusion, Fusion did not indicate in any report, measurement, phone call, or otherwise, that the shaft had any additional "run out" or that in any respect it was in worse condition than indicated by the measurements provided by B & B and American Diesel. Furthermore, upon inspection after the repairs, there was no indication of any physical damage to the shaft which would have been present had the shaft been dropped. The Court finds that the additional "run out" was caused due to improper repairs or handling of the shaft by Fusion. Likewise, because tapering can only occur due to removal (grinding) of more material in one area than another, and prior to Fusion's repairs the shaft was

not tapered, the Court finds that the tapering occurred during the grinding process at Fusion's shop. Similarly, after the Fusion repairs, the crankpins remained oval. The Court finds Fusion improperly repaired the crankpins because it did not cure the crankpin ovality.

12. Fusion has suggested that the problems noted in the post-repair inspections were the result of mismeasurement, because American Diesel's micrometer was not calibrated. The Court does not find this to be a credible argument.

13. At the time the shaft was first taken to American Diesel's facilities on or about October 8, 1999, it was measured with American Diesel's micrometer by an American Diesel representative. The measurements were witnessed by several others, including Ben Haveman, a B & B representative, a class surveyor, and/or an engine manufacturer's representative. There was no dispute by any of these individuals regarding the measurements taken nor the operation of the micrometer.

14. After the shaft was taken to Fusion, Fusion did not dispute the measurements by American Diesel or others, which it should have and would have done immediately had there been a significant discrepancy. Instead, Fusion conducted the repairs and returned the shaft. After the shaft was returned to American Diesel, it was remeasured by American Diesel and/or the other mentioned individuals. All of these measurements were consistent.

15. Additionally, after the inception of the litigation, the shaft was returned to Houston for another inspection. There, it was measured with the same American Diesel micrometer by American Diesel and by Ben Haveman, B & B's surveyor. Both their readings were identical. The shaft was also measured by Fusion whose readings were quite similar to those of American Diesel and quite different from Fusion's readings at the time of the repair.

It is noteworthy that prior to the inspection readings, both micrometers were calibrated and that prior to every reading, American Diesel regularly calibrates the micrometer.

16. Furthermore, the Court finds that the issue of American Diesel's micrometer is not relevant to the issues of the faulty repairs and damages. Regardless of what the various readings were relative to one another, the fact remains that the shaft was in a certain condition when it was sent to Fusion and it was returned in a worse condition.

17. When the representative of the engine manufacturer, Walter Brede of Deutz AG, saw the condition of the crankshaft upon its redelivery to New Orleans on or about October 20, 1999, he categorically stated the crankshaft was unacceptable. The independent Classification Society surveyor for the vessel, Alfred Schroeder of Germanischer LLoyd, condemned the crankshaft, thereby precluding its further use. In light of this, the vessel would have been in violation of Coast Guard rules and regulations and its owners subject to fines and penalties if the defectively repaired crankshaft had been replaced in the engine.

18. When it was discovered that Fusion's repairs were defective, the plaintiff was presented with a dilemma. It could either attempt to re-repair the crankshaft by further grinding or it could order a replacement crankshaft from the manufacturer. While defendants have argued that B & B failed to mitigate its damages because it did not allow them to attempt another repair, the Court finds that the plaintiff's decision to replace the crankshaft was entirely reasonable under the circumstances and that its damages would very likely have been even greater had it attempted to re-repair the crankshaft, assuming those efforts would have been successful.

19. To re-repair the crankshaft would have required that it be re-ground. The only reasonably accessible place this could be done was at Fusion's facility in Houston. Understandably, plaintiff was reluctant to entrust the work to the same company which had failed to do the work properly the first time. Beyond this, however, it was established at trial that even if the re-grinding of the crankshaft had been done correctly and expeditiously, the WESER would have been delayed some four to five weeks while replacement bearings were obtained from Germany. The vessel would have been out of service during that time. This delay results from the fact that the re-ground crankshaft would necessarily have been smaller, or undersized, by at least an additional 0.5 millimeters, for the reasons explained above. This would have required new bearings that, because of their uncommonly small size, were not standard equipment that the plaintiff could readily purchase.[1] Had the repairs been done properly the first time, standard bearings could have been used and these are readily available from various suppliers. The plaintiff investigated how long it would take to get undersized replacement bearings manufactured and delivered to New Orleans and calculated that this would delay the ship an additional four to five weeks, and cost three times the amount of standard bearings. The loss of charter hire and related expenses that plaintiff would have sustained during this period would very likely have exceeded the damages plaintiff is now claiming. While a procedure called "peening" was also proposed, in which the "run out" or bend is ameliorated by hammering it back into

shape, the evidence adduced at trial indicated that Fusion had previously tried this without success. The Court finds that plaintiff's decision to replace the crankshaft, rather than attempt to re-repair it, was not unreasonable.

20. The new crankshaft arrived in Louisiana October 30, 1999.

21. American Diesel does not dispute that the repairs were not properly done. To the contrary, American Diesel has admitted that Fusion's work was of very poor quality.

22. **After** the crankshaft repairs were done and were discovered to have been defective, American Diesel sent an invoice to B & B which contained various terms and conditions which purported to limit American Diesel's liability. There is no evidence these terms were ever shown to B & B, much less agreed to, at the time the contract of repair was made. Moreover, there was no prior course of dealing between the parties since this was the first time B & B had utilized American Diesel's services.

23. Fusion sent American Diesel an invoice which it alleged contained various terms and conditions on the back which purported to limit Fusion's liability to $6,300.00, the value of its repairs (sometimes called a "red-letter clause").

24. However, there is no evidence of any limitation contained on the invoice submitted by Fusion. Fusion has failed to produce a single invoice, whether submitted to American Diesel or any other entity, at any time or place, providing for such a limitation. The only copies provided do not include a copy of the back of the invoice in question, where the red-letter

---

1. Originally, the crankshaft measured 300mm; prior to grinding at Fusion, it measured 299.5mm. After grinding at Fusion, it measured 298.5mm. The manufacturer recommends a tolerance of no less that 298mm. Thus, theoretically, the crankshaft could have been re-ground another 0.5mm, but that would have necessitated the non-standard bearing.

clause was purportedly set forth. No proof has been offered concerning the liability limiting language purportedly contained on the invoice. Notably, the front of the Fusion invoice contains no alerting language indicating to the reader that important terms are contained on the reverse.

25. Moreover, no prior course of dealings existed between American Diesel and Fusion that would justify imputing knowledge of the limitation to American Diesel. The trial testimony revealed that the parties had previously had three dealings over a period of about two years, and that during this time, the content on the reverse of the invoices may have changed. Fusion was acquired by an entity called Praxair shortly before the agreement in question was entered into, a fact which suggests American Diesel would have been foolish to assume anything about the language contained on the Fusion invoice.

26. Further, at this time, neither American Diesel nor Fusion are in possession of the Fusion invoices.[2] Consequently, although Fusion claims a limitation of liability based upon a red-letter clause contained within those invoices, no evidence exists to support this claim, and it is impossible to know exactly what was sent by Fusion to American Diesel.

27. An additional factor weighing in favor of denying Fusion any limitation of liability based on language allegedly contained on the reverse of its invoice, is that prior to conducting business with Fusion, American Diesel requested evidence of insurance, and Fusion submitted a certificate of insurance evidencing $3,000,000 in coverage and naming American Diesel as a certificate holder/additional assured. Relying on this representation, American Diesel assumed Fusion had $3,000,000 of insurance which protected American Diesel in the event of Fusion's negligence or breach, not that in spite of that insurance Fusion could allege a limitation of $6,300.

28. The Court finds that given the failure of proof of the existence and nature of the alleged limitation of liability language, the limited dealings between American Diesel and Fusion prior to the agreement that is the subject of this suit, and the representations made regarding insurance and the understanding and requirements of American Diesel in that respect, that any limitation of liability by Fusion to American Diesel is void and of no effect, assuming it otherwise existed.

29. As a result of the improper repairs to the crankshaft, plaintiff sustained the following damages:[3]

**2.** Fusion has argued that spoliation of evidence occurred because counsel for American Diesel misplaced the American Diesel vendor's file containing Fusion's invoices. The Court does not find there was any spoliation. Counsel for Fusion was provided numerous opportunities to view the file and did not. Counsel for American Diesel called counsel for Fusion on the date the file was received, counsel for American Diesel wrote to counsel for Fusion inviting him to review or copy the file, and there was no response from Fusion's counsel for several weeks. On the date that he decided to review the file, he was invited to review the file and it was then discovered that it had been misplaced. It was assumed that the file had been copied by American Diesel prior to forwarding to its counsel. A copy of the file was obtained. Unfortunately, American Diesel's secretary had copied only the front of the invoice. Under these facts and circumstances, the Court finds that there has been no spoliation, as there clearly was no intentional destruction nor withholding of evidence. See infra, note 8.

**3.** Based on an exchange rate of 1DM = US$ 0.53916, the published rate for November 1, 1999, the date on which replacement of the crankshaft commenced. The Court observes that while this rate was submitted by the parties in joint exhibit 26, application of this rate to the figures supplied by the plaintiff in its claim statement (joint exhibit 16) results in figures different from the totals provided in that same claim statement.

| Description | DM | USD |
|---|---|---|
| Replacement crankshaft | 225,000.00 | 121,311.00 |
| DEUTZ AG transportation, packing and preservation of the replacement crankshaft | 18,275.00 | 9,853.15 |
| Germanischer Lloyd survey at American Diesel | 1,293.70 | 697.51 |
| Ten days G.O. consumption | 1,090.98 | 588.21 |
| 10 days off-hire [4] (DM 7,200 × 10 days) | 85,176.00 | 38,819.52 |
| Ten days berth and agency fees | | 3,979.70 |
| Ten days DEUTZ service engineer (DM 1380 per day, plus expenses of DM 290) × 10 days | 16,700.00 | 9,003.97 |
| TOTAL [5,6] | | 184,253.06 |

## CONCLUSIONS OF LAW

■ 1. This Court has jurisdiction over this action as one in admiralty because it arises out of a ship repair contract. *See, Kuehne & Nagel v. Geosource, Inc.,* 874 F.2d 283 (5th Cir.1989); 28 U.S.C. § 1333 (West 2001). Venue is proper in the Eastern District of Louisiana.

■ 2. In its oral contract with B & B, American Diesel agreed to repair the damaged crankshaft to such condition that it could be reinstalled in the vessel. Under maritime law, an oral contract is binding. *Kossick v. United Fruit Co.,* 365 U.S. 731, 734 n. 4, 81 S.Ct. 886, 889 n. 4, 6 L.Ed.2d 56 (1961). American Diesel admittedly failed to repair the crankshaft as agreed. American Diesel was therefore in breach of its contract with B & B and is liable for all damages suffered by B & B as a result of the breach. *See, Rex Oil, Ltd., v. M/V JACINTH,* 873 F.2d 82 (5th Cir.1989).

■ 3. B & B's damages are not limited by the red-letter clause contained on the American Diesel invoice. "Clauses that purport to limit a party's legal responsibility are strictly construed and to be given effect must clearly express the intent of all parties whose liability is altered by the agreement." *Nathaniel Shipping, Inc. v. General Electric Co.,* 920 F.2d 1256 (5th Cir.1991) (quotations omitted). In this case, B & B did not receive the invoice until after the work had been performed, and thus could not have agreed to it in advance of the work. And, while the Court recognizes that "[w]here parties share a history of business dealings and standardized provisions have become part of those dealings, such familiar provisions . . . issued after performance are binding if they are accepted without objection," *Campbell v. Sonat Offshore Drilling,* 979 F.2d 1115, 1120 (5th Cir.1992) (superseded by statute on other grounds), in this case,

4. Plaintiff requested reimbursement for 11.83 days off-hire. However, the evidence indicated that the crankshaft was transported to American Diesel on October 20, 1999, and the replacement crankshaft arrived in New Orleans on October 30, 1999. Joint exhibit 54 at 167. Therefore, the Court calculates off-hire time contributable to the breach at ten days.

5. Plaintiff also requested reimbursement fees for flight tickets and inspection costs for Mr. Dirk Schmidt. American Diesel argues, and the Court agrees, that because Schmidt's presence would have been required absent the breaches of American Diesel and Fusion, B & B is not entitled to damages for those amounts.

6. The Court notes that in general, the evidence introduced in support of the damages claimed was not comprehensive, in that the amounts claimed in plaintiff's claim statement are not readily correlated to supporting documents in the record. *See,* joint exhibit 54 (also addressed in the testimony of Ben Haveman), and joint exhibit 16. However, because defendants have lodged no serious objections to the content of the claim statement, the Court has awarded damages in conformity therewith, except where the amounts claimed clearly are not supported by the record or were based on miscalculating the deutschemark to dollar exchange.

B & B and American Diesel had no prior dealings.

4. Plaintiff acted reasonably to mitigate its damages by electing to obtain a replacement crankshaft rather than allowing a subcontractor who had demonstrated that it was not capable of properly repairing the crankshaft attempt to re-repair it, under circumstances where the outcome was uncertain but additional costs were sure to follow even in the best case. The evidence shows plaintiff's damages total $184,253.06. In admiralty, pre-judgment interest is awarded absent peculiar circumstances, none of which are present here. *Todd Shipyards Corp. v. Auto Transp., S.A.,* 763 F.2d 745 at 753 (5th Cir.1985). Consequently, plaintiff is awarded pre-judgment interest, compounded daily, from October 19, 1999, the date on which Fusion completed the defective crankshaft repairs. Plaintiff is entitled to a judgment against American Diesel[7] in that amount, plus interest and all costs of these proceedings.

5. While American Diesel is liable for breach of contract to B & B, American Diesel has the right to seek full indemnity from Fusion. *Todd Shipyards Corp. v. Turbine Service, Inc.,* 674 F.2d 401, 416 (5th Cir.1982).

6. Implied in ship repair contracts is a warranty of workmanlike performance ("WWLP"). *Employers Ins. of Wausau v. Suwannee River Spa Lines, Inc.,* 866 F.2d 752, 763 n. 17 (5th Cir.1989), citing *Ryan Stevedore & Co. v. Pan–Atlantic Steamship Corp.,* 350 U.S. 124, 133–34, 76 S.Ct. 232, 237–38, 100 L.Ed. 133 (1956). While Fusion has argued that the WWLP is no longer recognized in this circuit, the cases cited in support of this proposition discuss

the WWLP is the context of third-party indemnity actions, in which a plaintiff has sued a third-party, with whom it was not in privity of contract, for breach of the WWLP. In cases like ours, in which the action for breach of WWLP is brought by one with whom the warrantor contracted directly, the admiralty law recognizes that the "obligor in a service contract has a duty to perform his or her task with reasonable care, skill, and diligence." *Caribbean Bulk Carriers, Ltd. v. Motor–Services Hugo Stamp, Inc.,* 1996 WL 210716, *3 (E.D.La. Apr.26, 1996), citing 1 T. Schoenbaum, *Admiralty and the General Maritime Law* § 508 at 190 (2d ed.1994).

7. Fusion impliedly warranted that it would perform its service in a diligent and workmanlike manner when it agreed with American Diesel to repair the WESER's crankshaft according to American Diesel's measurements and instructions. *See id; see also, Liberty Belle Limited Partnership v. M.I.T. Marine Electric Corp.,* 1991 A.M.C. 2330, 1991 WL 201633, *3 (M.D.Fla.1991). Fusion breached the WWLP because it failed to repair the crankshaft in accordance with American Diesel's measurements and repair instructions, and returned the crankshaft to American Diesel in worse condition than when it left American Diesel for Fusion's facility. Fusion is therefore liable to American Diesel for the damages which foreseeably resulted from its breach. *Id.* at *2.

8. With respect to Fusion's argument that its liability is limited to the amount of repairs, or $6,300.00, based on a red-letter clause found on the reverse of its invoice, Fusion has not produced its own invoices, which allegedly contain the

---

**7.** Plaintiff has acknowledged that its tort claim against Fusion, American Diesel's subcontractor, is not viable under the holding in *Nathaniel Shipping, Inc. v. General Electric Company,* 920 F.2d 1256, on rehearing, 932 F.2d 366 (5th Cir.1991), and accordingly, has abandoned that claim.

red-letter clause. Moreover, the copy of the front, which Fusion has supplied, does not contain any alerting language directing the reader to consult the back of the invoice for important terms. *See, Coastal Iron Works, Inc. v. Petty Ray Geophysical,* 783 F.2d 577, 582 (5th Cir.1986). Consequently, Fusion has not met its burden of proof to show that a valid limitation of liability clause existed between itself and American Diesel.[8]

9. As stated above, a significant course of dealings between parties who are aware from their prior dealings of liability limiting terms contained on an invoice may justify giving effect to the limitation of liability in subsequent dealings where the invoice is sent after performance. *Campbell, supra.* The Court finds that in this case, there was no significant course of dealings between Fusion and American Diesel that would justify enforcing the red-letter clause. The parties had had only three prior dealings, over a course of nearly two years, and the content contained on the reverse of the invoice changed during that period. Additionally, Fusion was purchased by Praxair, an entirely different entity, shortly before the contract at issue here.

10. Further, Fusion's provision to American Diesel of a certificate of insurance in the amount of $3,000,000, naming American Diesel as certificate holder/additional assured, at the inception of its business relationship with American Diesel, also weighs against any finding that American Diesel should have known of the $6,300.00 limitation.

██ 11. Accordingly, American Diesel is entitled to a judgment against Fusion in the amount of $184,253.06, the amount of damages that American Diesel is required to pay to B & B. Further, "[i]n this circuit foreseeable damages recoverable for breach of warranty of workmanlike performance include reasonable attorneys' fees and litigation expenses." *Todd Shipyards Corp. v. Turbine Service, Inc.,* 674 F.2d 401, 415 (5th Cir.1982)(quotations and other citations omitted). Accordingly, American Diesel is also entitled to an award of its attorney fees incurred defending against B & B for Fusion's breach of the warranty of workmanlike performance.

Accordingly;

**IT IS ORDERED** that judgment be entered herein in favor of B & B and against American Diesel, and in favor of American Diesel and against Fusion, Inc., in accordance with the foregoing;

**IT IS FURTHER ORDERED** that American Diesel shall submit a statement of attorney's fees incurred defending the suit by B & B to the assigned Magistrate Judge for determination of the amount owed it for attorney's fees, within fifteen days of entry of this order.

---

**8.** Fusion asserts that American Diesel intentionally withheld the Fusion invoices which pertain to the crankshaft repair work in an attempt to circumvent the red-letter clause contained on the reverse of the invoice. In the Fifth Circuit, both destruction of evidence and bad faith are required to give rise to a finding of spoliation or destruction of evidence. *United States of America v. Wise,* 221 F.3d 140 (5th Cir.2000). American Diesel made several good faith attempts to make the requested Fusion invoices available to Fusion; apparently, by the time Fusion decided to take them up on the offer, it was learned that they had been misplaced. Under these circumstances, the Court finds American Diesel did not act in bad faith, and no spoliation occurred. The Court also observes that the Fusion invoices at issue are Fusion-generated documents, and American Diesel should not be held liable for Fusion's failure to produce the content of its own documents.